IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PULSE MEDICAL INSTRUMENTS, INC.       :

                                                :

    v.                             :  Civil Action No. DKC 07-1388

                                                  :

DRUG IMPAIRMENT DETECTION
SERVICES, LLC                      :

**MEMORANDUM OPINION**

Presently pending and ready for review in this patent infringement case are two motions: Plaintiff's motion to exclude the expert testimony of David J. Harkavy (ECF No. 116),[1] and Defendant's motion to exclude the expert testimony of Carlos Valeiras (ECF No. 118). The issues have been fully briefed, and the court now rules, no hearing deemed necessary. Local Rule 105.6. For the following reasons, both motions to exclude will be denied.

---

[1] PMI also filed a motion to seal Mr. Harkavy's report due to DIDS' designation of the report as confidential. (ECF No. 117). For the limited purpose of considering the pending motions, the motion to seal will be granted.

## I.   Background

The facts of this case have already been set forth in ECF No. 87 and ECF No. 110,[2] and will be only briefly summarized here.   Plaintiff Pulse Medical Instruments, Inc. ("PMI") was organized in 1988 to develop and commercialize technology for measuring human eye responses to screen subjects for drug, alcohol, and sleep deprivation-related impairments.   On June 6, 1995, PMI became the exclusive holder of U.S. Patent 5,422,690 ("the '690 Patent"), known as a Fitness Impairment Tester.   The '690 Patent has been used in a variety of safety related industries, such as in coal mining to screen workers operating heavy equipment and in the criminal justice system to screen subjects for drug and alcohol use.

On or about June 18, 2004, PMI and Defendant Drug Impairment Detection Services, Inc. ("DIDS") entered into an agreement whereby PMI agreed to custom build drug impairment detection systems known as "FIT 2000 Screeners" ("Screeners").   In return, DIDS agreed to distribute these Screeners under the name "PassPoint."   DIDS retained ownership of the Screeners and

---

[2] *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., Inc.*, No. DKC 07-01388, 2010 WL 3781705 (D.Md. Sept. 23, 2010); *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., Inc.*, No. DKC 07-01388, 2009 WL 6898404 (D.Md. Mar. 20, 2009.

leased them to its customers, with charges made on a pay-for-service basis.   DIDS was required to pay PMI a fixed purchase price for each Screener, plus a 10% royalty for service fees that DIDS charged to its customers.   DIDS purchased its last Screener from PMI in October 2004.

In December 2005, DIDS began distributing its own substance abuse screener under the modified name "PassPoint.net."   On January 27, 2006, PMI sent a letter to DIDS terminating their agreement.   On May 25, 2007, PMI filed a complaint against DIDS for patent infringement, alleging that PMI's '690 Patent was infringed by DIDS's PassPoint.net product line.   (ECF No. 1). DIDS filed an answer and counterclaims on October 15, 2008. (ECF No. 8).

After resolution of various motions, the parties began discovery.   PMI served the report of its damages expert, Carlos Valeiras, on DIDS on June 20, 2008.   Pursuant to the parties' assented-to schedule, on May 2, 2011, DIDS served the responding report of their damages expert, David J. Harkavy, on PMI.   On August 1, 2011, PMI filed the pending motion to exclude the testimony of Mr. Harkavy.   (ECF No. 116).   DIDS opposed PMI's motion on August 15, 2011.   (ECF No. 119).   PMI replied on August 31, 2011.   (ECF No. 122).   Also on August 1, 2011, DIDS

3

filed its own motion to exclude the testimony of Mr. Valeiras. (ECF No. 118).  PMI filed opposition papers on August 17, 2011. (ECF No. 120).  On August 31, 2011, DIDS replied.  (ECF No. 121).

## II.  Standard of Review

Under Federal Rule of Evidence 702, the district court has "a special obligation . . . to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 provides,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Court of Appeals for the Fourth Circuit explained Rule 702 as follows:

> The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable — that is,

4

> whether it is supported by adequate
> validation to render it trustworthy. *See*
> [*Daubert*, 509 U.S.] at 590 n.9, 113 S.Ct.
> 2786. The second prong of the inquiry
> requires an analysis of whether the opinion
> is relevant to the facts at issue. *See id.*
> at 591-92, 113 S.Ct. 2786.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 196 (D.Md. 2003).

To be considered reliable, an expert opinion "must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert*, 509 U.S. at 592-93). The district court enjoys "broad latitude" in determining the reliability and admissibility of expert testimony, and its determination receives considerable deference. *Kumho Tire Co.*, 526 U.S. at 142 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997)); *see also Oglesby*, 190 F.3d at 250.

**III. Analysis**

    **A.    PMI's Motion to Exclude Mr. Harkavy's Testimony**

    **1.    Mr. Harkavy's Testimony Regarding His Reasonable Royalty Analysis**

PMI advances two primary arguments for excluding the portions of Mr. Harkavy's report that address his estimation of damages suffered by PMI. First, PMI argues that Mr. Harkavy improperly "usurps the role of the Court in instructing the trier of fact" by discussing the case of *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970). (ECF No. 116, at 7). Second, PMI argues that Mr. Harkavy is not an expert in negotiations and should be barred from opining on the "hypothetical negotiations" that *Georgia-Pacific* advocates for use in determining a reasonable royalty rate for patent damages purposes. (*Id.* at 7-10). DIDS disagrees on both fronts, pointing to Mr. Harkavy's extensive education and experience related to damages issues in response.

PMI's first argument has no merit. *Georgia-Pacific* is a seminal case in patent law because of its articulation of fifteen factors that a court may consider when determining a reasonable royalty rate for estimating patent damages. *See Ga.-*

*Pac. Corp.*, 318 F.Supp. at 1120.[3]   The United States Court of

Appeals for the Federal Circuit has repeatedly endorsed the

_____

[3] The fifteen factors are:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
> 7. The duration of the patent and the term of the license.
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Ga.-Pac. Corp.*, 318 F.Supp. at 1120.

analysis of these factors as a reliable method of estimating patent damages.  *E.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003).

While it is ultimately within the province of the trier of fact to make the final determination of damages should liability be found, the estimation of damages is an issue for which courts time and again seek the assistance of experts to resolve. Indeed, courts in this circuit as well as others have consistently looked to experts to apply the *Georgia-Pacific* factors.  *E.g.*, *Monsanto Co. v. David*, 516 F.3d 1009, 1018-19 (Fed. Cir. 2008); *Freeman v. Gerber Prods. Co.*, 450 F.Supp.2d 1248, 1261-63 (D.Kan. 2006); *Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 325 F.Supp.2d 612, 619 (E.D.N.C. 2003).  Here, Mr. Harkavy's discussion of the *Georgia-Pacific* factors is reasonable.  Far from being testimony regarding "pure questions of law," as PMI contends (ECF No. 116, at 7), Mr. Harkavy's references to these factors in Exhibit 4 of his report are in the context of the facts of this case.  As such, Mr. Harkavy's analysis of the *Georgia-Pacific* factors can assist the trier of fact regarding the damages issue and is therefore admissible.

PMI's second argument fares no better for largely the same reasons.  The application of the *Georgia-Pacific* factors for the

purpose of determining a reasonable royalty rate for patent damages is a framework for envisioning a hypothetical negotiation between the parties. *See Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F.Supp.2d 991, 1011-12 (W.D.Wis. 2005) ("To [award a prevailing patentee in a patent case 'damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer'], courts engage in a fiction:  they imagine a negotiation between the patentee and infringer taking place at the moment the infringement began.").  In applying these factors, damages experts are called upon to opine about a hypothetical negotiation.  Whether characterized as "applying the *Georgia-Pacific* factors" or as "conducting a hypothetical negotiation," the process is one and the same, and courts have accepted this process as falling within the bailiwick of damages experts.  *See, e.g., i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852-53 (Fed. Cir. 2010) (affirming a damages expert's analysis of a "hypothetical negotiation" between the parties and the *Georgia-Pacific* factors to determine a reasonable royalty rate).  No separate showing of expertise in negotiating is needed.

Here, PMI attempts a sleight of hand by focusing on the *tool* employed by damages experts like Mr. Harkavy to estimate patent damages rather than his *area* of expertise.  PMI does not challenge Mr. Harkavy's credentials as a *damages expert*, however, making it appropriate for him to opine within the boundaries of the subject of damages, which includes using the tools of the trade.  These tools include imagining a hypothetical negotiation to determine a reasonable royalty rate. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (endorsing "the conceptual framework of a hypothetical negotiation between the patentee and the infringer as a means for determining a reasonable royalty"). To the extent Mr. Harkavy's negotiating experience is, in fact, deficient, this sort of gap in his knowledge "go[es] to the weight of [his] testimony, not its admissibility."  *See* 29 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6265 (2011); *see also Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.").

11

In any event, any concerns about Mr. Harkavy not having the requisite background in negotiating are misplaced, as the hypothetical negotiation for determining a reasonable royalty differs substantially from a "real-world" negotiation. *See Cummins-Allison Corp. v. SBM Co.*, 584 F.Supp.2d 916, 917-18 (E.D.Tex. 2008). The *Georgia-Pacific* hypothetical negotiation uses "common, fixed assumptions," which are by definition "artificial" to enable a reasonable royalty calculation. *Id.* at 918; *see also Ariba, Inc. v. Emptoris, Inc.*, 567 F.Supp.2d 914, 917 & n.2 (refraining from expanding the well-settled assumptions that accompany a *Georgia-Pacific* analysis). Because of this artificiality, there has simply been no showing that Mr. Harkavy lacked the necessary negotiating expertise to be able to assist the trier of fact in understanding a damages analysis that relies on the *Georgia-Pacific* factors. Accordingly, Mr. Harkavy's testimony regarding his own reasonable royalty estimate for damages purposes is admissible.

### 2. Mr. Harkavy's Testimony Regarding Mr. Valeiras's "Lost Opportunity" Analysis

PMI advances three arguments for excluding the portions of Mr. Harkavy's report that directly rebut Mr. Valeiras's "lost opportunity" analysis. First, PMI contends that because Mr. Harkavy's background is not identical to Mr. Valeiras, Mr.

Harkavy is not qualified to opine about Mr. Valeiras's expert testimony. (ECF No. 116, at 10-11). DIDS again points to Mr. Harkavy's extensive education and experience in response. Second, PMI argues that portions of Mr. Harkavy's report do not constitute rebuttal. (*Id.* at 11-12). DIDS essentially agrees, but states that the portions in question were intended to support Mr. Harkavy's affirmative testimony regarding his reasonable royalty analysis. Third, PMI asserts that because the portion of Mr. Harkavy's report that directly address's Mr. Valeiras's discounted cash flow analysis was based on another person's work, that portion should be excluded. (*Id.* at 12-13). DIDS responds that this section was prepared "under the direction and supervision" of Mr. Harkavy and is admissible. (ECF No. 119, at 6).

As to PMI's first argument, Federal Rule of Evidence 702 has been liberally construed to allow witnesses to be qualified to testify as experts based on a variety of different methods, specifically identifying "knowledge, skill, experience, training, or education" as different bases for qualification. *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("The witness' qualifications to render an expert opinion are also liberally judged by Rule 702."). There is no requirement that

experts share identical backgrounds to be able to opine about the same subject. *See* Wright & Gold, *supra*, § 6265 (stating that the requirement that the area of an expert's competence match the subject matter of his testimony "does not mean that an opinion on a given issue can only be given by an expert in a single, specific discipline"). In fact, an expert witness need not have an identical background as another expert witness to rebut the latter's testimony, so long as both witnesses are qualified to testify as experts on the same designated issues. *See United States v. Madoch*, 935 F.Supp. 965, 972 (N.D.Ill. 1996).

Here, both Mr. Harkavy and Mr. Valeiras have been put forth by the parties as their respective damages experts. As discussed above, PMI does not take issue with Mr. Harkavy's general qualifications as a damages expert. Therefore, Mr. Harkavy is qualified to testify as to all issues relevant to damages in this case, which necessarily include rebuttal of PMI's damages expert. Any issues that PMI has with Mr. Harkavy's qualifications vis-à-vis Mr. Valeiras's background are more "properly explored on cross-examination," going to "his testimony's weight and credibility — not its admissibility." *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2$^{d}$ Cir.

14

1995); *see also Avondale Mills, Inc. v. Norfolk S. Corp.*, No. 1:05-2817-MBS, 2008 WL 6928257, at *3 (D.S.C. Feb. 6, 2008) (denying motion to exclude expert in part because his expertise within a specific industry may be tested on cross-examination).

PMI's second argument is easily dismissed.  PMI contests the relevance of Sections III and IV of Mr. Harkavy's expert report with respect to rebutting Mr. Valeiras's report.  As DIDS explained, however, these sections, which address background facts and information to give context to Mr. Harkavy's damages valuation method, are relevant to Mr. Harkavy's overall expert opinion in his report.  Nothing in Rule 702 precludes an expert witness from giving some context to his opinion.  Indeed, Rule 702 itself states that an expert witness may testify if, among other things, "the testimony is based upon sufficient facts or data."  Fed.R.Evid. 702.  Some factual discussion is therefore expected in an expert report.  Here, sections III and IV of Mr. Harkavy's report do not read as anything other than general background to his report and are therefore proper.

PMI's third argument is likewise easily dismissed.  Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is

reasonably relied upon by experts in the relevant area of expertise.   *See, e.g., Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002); *Bouygues Telecom, S.A. v. Tekelec*, 472 F.Supp.2d 722, 728 (E.D.N.C. 2007); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F.Supp.2d 30, 36-37 (D.D.C. 2004).

Here, Mr. Harkavy has unequivocally testified that he supervised the preparation of his expert report, including the portions that address the discounted cash flow analysis that is at the heart of Mr. Valeiras's report.   He admits to relying on the work of Mitch Rosen, but he consistently states that Rosen's work only formed the basis of his report and that he is the ultimate author of the findings contained therein.   For example, Mr. Harkavy testified at his deposition that:

> A: *With my supervision*, Mitch [Rosen] worked on schedules of the report and I believe one of [the] sections of the report.   Because Mitch worked on certain schedules, he *assisted* in the writing of the Exhibit 5 to *my report* entitled, Deficiencies in Mr. Valeiras'[s] Discounted Cash Flow Calculation.

(ECF No. 116-3, Harkavy Dep., at 5) (emphases added).   Even the deposition testimony that PMI points to in this regard (ECF No. 116, at 12) does not indicate any unreasonable reliance on Rosen's work:

16

> A: First Mitch went through Val[ei]ras'[s]
> calculations and we talked about the
> omissions, lack of support, unexplained
> assumptions in Mr. Val[ei]ras'[s]
> calculation. So we went through each one of
> those items and determined what we were
> going to say in my report. *So it's sort of
> a team effort to get through this section.*
> Mitch was responsible for drafting some of
> the language and, *under my supervision*, I
> worked with him and this is the result,
> Exhibit 5.

(ECF No. 116-3, Harkavy Dep., at 5) (emphases added). Given the complexity of damages issues in patent infringement cases, it is reasonable that Mr. Harkavy would have relied on the work of others to complete his report. As with the previously discussed issues, PMI is free to question the weight and credibility that should be afforded Mr. Harkavy's opinion on this issue, but the section of his report that relies on Rosen's work is nonetheless admissible.

Accordingly, PMI's motion to exclude the expert testimony of David J. Harkavy will be denied.

**B.  Defendant's Motion to Exclude Mr. Valeiras's Testimony**

DIDS puts forth four arguments for excluding Mr. Valeiras from testifying as PMI's damages expert.  First, DIDS argues that Mr. Valeiras is not qualified to testify as an expert with respect to damages.  (ECF No. 118, at 3-4).  PMI responds by pointing to Mr. Valeiras's credentials and experience.  Second,

17

DIDS argues that Mr. Valeiras's theory of damages does not comport with the requirements of *Daubert*, and, specifically, that it does not follow the *Georgia-Pacific* analysis. (*Id.* at 4-8). In response, PMI notes that *Daubert*'s requirements are not comprehensive, and that Mr. Valeiras's report does, in fact, track some of the *Georgia-Pacific* factors. Third, DIDS argues that Mr. Valeiras's damages theory relies too heavily on speculation and conjecture. (*Id.* at 9-13). PMI disagrees. And fourth, DIDS argues that Mr. Valeiras is improperly biased in favor of PMI, which potentially taints his conclusions. (*Id.* at 13-15). Again, PMI disagrees, and PMI further notes that even if Mr. Valeiras were found to be biased, that is not a basis for exclusion under the Federal Rules of Evidence.

Regarding DIDS's first argument, for many of the same reasons that DIDS's expert, Mr. Harkavy, is qualified to testify as to damages, Mr. Valeiras is also qualified to testify. Rule 702 is liberally construed to allow witnesses to be qualified to testify as experts based on a variety of different methods, specifically identifying "knowledge, skill, experience, training, or education" as different bases for qualification. *See Kopf*, 993 F.2d at 377. Here, Mr. Valeiras has had extensive education and experience in the valuation of "patents, licenses,

18

and other forms of tangible property." (ECF No. 116-1, Valeiras Rep., at 2).   There is no reason to conclude that he cannot assist the trier of fact in the estimation of damages in this case.

DIDS's second argument is also unavailing.   When applying *Daubert* to challenged expert testimony, courts typically consider several factors, including:   (1) whether the expert opinion can be tested; (2) whether the expert opinion has been subjected to peer review; (3) the rate of error of the methods employed by the expert; and (4) whether the expert's method has been generally accepted by his community.   *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 261 (4th Cir. 2005) (citing *Daubert*, 509 U.S. at 592-94).   As *Daubert* itself cautioned, however, these four guideposts are not necessarily comprehensive.   *Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry [of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue], and we do not presume to set out a definitive checklist or test."); *see also Fireman's Fund Ins. Co. v. Tecumseh Prods. Co.*, 767 F.Supp.2d 549, 553 (D.Md. 2011) (holding that the indicia of reliability of expert testimony

"may, but need not, include" the four *Daubert* factors).   As such, while courts should be discerning when an expert presents a novel approach to resolving an issue, they should not automatically dismiss that approach out-of-hand.   The burden, however, of establishing admissibility is always on the party seeking admission of the expert testimony.   *Fireman's Fund Ins. Co.*, 767 F.Supp.2d at 553.

Damages in patent infringement cases are provided for by statute.   35 U.S.C. § 284 ("[T]he court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . .").   "Despite the broad damages language of § 284, patentees tend to try to fit their damages cases into the 'lost profits' framework, or else fall back on the statutory grant of a reasonable royalty."   *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008) (citing 7 Donald S. Chisum, *Chisum on Patents* § 20.01 (2005)), *amended by* 557 F.3d 1377 (Fed. Cir. 2009).   The Federal Circuit in *Mars, Inc.* recognized, however, that the two most common methods for estimating patent damages, lost profits and reasonable royalty rate, are not necessarily the only such methods.   *See id.*   Thus, even though the Federal Circuit has

20

repeatedly endorsed analysis of the *Georgia-Pacific* factors to estimate a reasonable royalty rate for the purposes of calculating patent damages, *e.g.*, *Micro Chem., Inc.*, 317 F.3d at 1393, as a matter of law, analysis of the *Georgia-Pacific* factors and a lost profits analysis are not the only methods of assessing potential damages.

Here, Mr. Valeiras veers from the well-trod path of court-approved patent damages calculation methods by first calculating a "lost opportunity" value for PMI and then using that "lost opportunity" value to estimate a licensing fee of 13.5%, which appears to be tantamount to a reasonable royalty rate. (*See generally* ECF No. 116-1, Valeiras Rep.).[4] As DIDS points out, Mr. Valeiras does not refer even once in his report to the *Georgia-Pacific* factors.[5] While Mr. Valeiras's approach is not one of the traditional methods of estimating patent damages, it is not unreasonable that Mr. Valeiras's approach might in the

---

[4] In fact, DIDS refers to Mr. Valeiras's calculation of the 13.5% licensing fee as "his royalty rate." (ECF No. 121, at 5).

[5] In its opposition, PMI attempts to shoehorn the contents of Mr. Valeiras's report into a *Georgia-Pacific* framework, managing to match the points he makes with five of the fifteen factors. As discussed in this opinion, however, this effort is unnecessary because *Georgia-Pacific* is not, as a matter of law, the only way to calculate damages.

end be a better method for calculating damages than the traditional methods.  Mr. Valeiras notes in his report:

> In this case, . . . it is my opinion that the value of the patent alone does not capture the damages suffered by [PMI].  One needs to look at the potential for sales of its equipment had PMI invested in sales and marketing efforts.  One also needs to consider the lost income over the past four years due to the focus that [DIDS] placed on product development rather than marketing.

(ECF No. 116-1, Valeiras Rep., at 3).  Thus, in Mr. Valeiras's opinion, the facts of this case appear to be different enough from the typical patent infringement case to warrant an alternative method for calculating damages.  The Federal Circuit has not foreclosed that possibility.  *See Mars, Inc.*, 527 F.3d at 1366 ("The correct measure of damages is a highly case-specific and fact-specific analysis.").

Although DIDS takes issue with the fact that Mr. Valeiras did not correctly employ the *Georgia-Pacific* factors, it advances no other argument why Mr. Valeiras's method itself should be disregarded.  In contrast, PMI has sufficiently argued that Mr. Valeiras's testimony is, at the very least, admissible.  As such, his expert testimony will not be excluded on this ground.

As to DIDS's third argument, DIDS attempts to poke multiple holes in Mr. Valeiras's "lost opportunity" methodology by arguing that his underlying assumptions are too speculative. The same flaw undermines each of DIDS's specific assertions here, however:  the various assumptions underlying Mr. Valeiras's report that DIDS takes issue with presuppose that Mr. Valeiras should have been applying the *Georgia-Pacific* factors or a lost profits analysis in the first place.  For example, DIDS cites to *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006), to attack Mr. Valeiras's opinion, but *DSU Medical Corp.* concerned the calculation of lost profits.  *Id.* at 1308. Similarly, DIDS's citation to *Rosco, Inc. v. Mirror Lite Co.*, 626 F.Supp.2d 319 (E.D.N.Y. 2009), is of no avail because that case had to do with application of *Georgia-Pacific*.  *Id.* at 332.[6] As already discussed, Mr. Valeiras presents an alternative method for estimating damages in patent infringement cases, which reasonably carries with it its own set of assumptions. Disputing the reasonableness of these assumptions against those of a lost profits or reasonable royalty analysis, although potentially analogous, is inapposite.

---

[6] DIDS also cites to *KW Plastics v. United States Can Co.*, 131 F.Supp.2d 1289 (M.D.Ala. 2001), but that case dealt with lost profits as well.  *Id.* at 1292.

Having reviewed Mr. Valeiras's report, it cannot be said that his assumptions behind his "lost opportunity" analysis are unwarranted, at least for the purposes of admissibility. This is not to say that Mr. Valeiras's methodology is impervious to criticism. Indeed, many of his assumptions should be tested by DIDS on cross-examination. At this juncture, however, only the admissibility of Mr. Valeiras's opinion is at issue, not the weight it should be afforded, and his opinion passes that threshold.

DIDS's fourth and final argument is easily dismissed. Alleged bias is ordinarily a question of credibility, not admissibility, Wright & Gold, *supra*, § 6265 ("[T]he courts may not consider credibility questions such as bias when exercising their discretion [as to whether a witness qualifies as an expert]."); *see also Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 580 (5th Cir. 1985) (holding that attacks on an expert witness's credibility are for the jury to resolve). Here, DIDS's allegations concerning potential bias on the part of Mr. Valeiras have no bearing on his qualifications to testify as a damages expert. DIDS is nonetheless free to cross-examine Mr. Valeiras on these issues.

Accordingly, DIDS's motion to exclude the expert testimony of Carlos Valeiras will be denied.

## IV.  Conclusion

For the foregoing reasons, both the motion to exclude the testimony of DIDS's expert David J. Harkavy filed by Plaintiff PMI and the motion to exclude the testimony of PMI's expert Carlos Valeiras filed by Defendant DIDS will be denied.    A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge